UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

MICHAEL EDWARDS,

                    Plaintiff,                           Case No. 1:20-cv-908

v.                                                              Honorable Paul L. Maloney

HEIDI WASHINGTON et al.,

                    Defendants.

_____/

## OPINION

        This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983.

Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the

Court is required to dismiss any prisoner action brought under federal law if the complaint is

frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary

relief from a defendant immune from such relief.  28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c).  The

Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520

(1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly

incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, the Court

will dismiss Plaintiff's complaint because it is frivolous and/or fails to state a claim.

### Discussion

I.        **Factual allegations**

        Plaintiff is presently incarcerated with the Michigan Department of Corrections

(MDOC) at the Lakeland Correctional Facility (LCF) in Coldwater, Michigan.  The events about

which he complains occurred at that facility and the Newberry Correctional Facility (NCF) in

Newberry, Michigan, the Chippewa Correctional Facility (URF) in Kincheloe, Michigan, the Macomb Correctional Facility (MRF) in New Haven, Michigan, the Alger Correctional Facility (LMF) in Munising, Michigan, and the Oaks Correctional Facility (ECF) in Manistee, Michigan. Plaintiff sues MDOC Director Heidi Washington, MDOC Emergency Management Section Manager Larry Brown, NCF Security Threat Group (STG) Coordinator A. Hubble, NCF Corrections Officer G. Moore, URF STG Coordinator Lieutenant Unknown Brown, MRF STG Coordinator Inspector Unknown Steece, LMF STG Coordinator Inspector Unknown Rutter, ECF STG Coordinator Unknown Dunn, and LCF STG Coordinator Lieutenant Unknown LaMontagne.

Plaintiff alleges that he "espoused to the Declaration of Faith and religious tenets of the Melanic Islamic Palace of the Rising Sun (Melanics) in 1990."  (Compl., ECF No. 1, PageID.5.)  Plaintiff reports that the MDOC recognized the Melanics as an official religion pursuant to a consent judgment in *Martin v. Boles*, No. 2:82-cv-72083 (E.D. Mich.).  The United States District Court for the Eastern District of Michigan terminated that consent judgment by order entered February 19, 1998.  *Id.*  The Sixth Circuit Court of Appeals affirmed the district court's termination of the consent judgment on September 24, 1999.  *Islamic Palace of the Rising Sun v. Johnson*, No. 98-1361, 1999 WL 775801 (6th Cir. Sept. 24, 1999).

In January 2000, the MDOC classified the Melanics as a security threat group (STG).  *Johnson v. Martin* [*Johnson I*], 223 F. Supp. 2d 820, 823 (W.D. Mich. 2002).  That classification followed a riot at URF involving a number of Melanic inmates.  *Johnson v. Martin* [*Johnson II*], No. 2:00-cv-75, 2005 WL 3312566, at *6 (W.D. Mich. Dec. 7, 2005).

The *Johnson* Plaintiffs raised several constitutional challenges to the MDOC's actions, including violation of the First Amendment Free Exercise Clause, violation of the

Religious Land Use and Institutionalized Persons Act (RLUIPA), violation of the Fourteenth Amendment Due Process Clause, and violation of the Fourteenth Amendment Equal Protection Clause.

The *Johnson* Plaintiffs challenged the classification of the Melanics as an STG, the ban of Melanic group worship, the confiscation of Melanic written materials and symbols, and a ban of Melanic written materials.  Court certified the following classes:

> (1) those current prisoners of the Michigan Department of Corrections who were members of the Melanic Islamic Palace of the Rising Sun ("Melanic") when it was designated as a security threat group by the Department of Corrections on January 7, 2000 and who either renounced membership in Melanic and/or were treated as members of a security threat group for not effectively renouncing membership in Melanic; (2) those current prisoners of the Michigan Department of Corrections who were members of Melanic as of January 7, 2000 and who have not been allowed to practice their religion in the same manner after the security threat group designation; and (3) those current prisoners of the Michigan Department of Corrections who were members of Melanic on January 7, 2000 and whose religious materials were confiscated after January 7, 2000 and/or who presently cannot possess Melanic religious materials.

*Johnson I*, 223 F. Supp. at 822 n.4.  Based on Plaintiff's allegations, it appears he was a member of the second class.  Indeed, Plaintiff indicates that class counsel communicated with him by correspondence as the litigation proceeded.  (Compl., ECF No. 1, PageID.6.)

The Court found that the Melanics espoused violence and racism and created a hierarchical structure that was different than, and potentially contrary to, the MDOC hierarchical structure.  The Court rejected the Melanics' claims regarding the designation of the group as an STG[1] and denied the claim that confiscation of Melanic materials as contraband violated the group

---

[1] The Court found that the defendants' decision to classify the Melanics as an STG and the decision to deny them group worship was appropriate under RLUIPA.  *Johnson v. Martin et al.* [*Johnson III*], No. 2:00-cv-75 (W.D. Mich. Jan. 27, 2003).  The Court determined that the STG designation did not impose a substantial burden under RLUIPA

members' First Amendment right to freely exercise their religion; however, the Court concluded

that under the RLUIPA, the MDOC could not simply ban all Melanic Literature.[2]  The Court held

that the MDOC would have to review the materials to determine whether they were a threat to the

safety and security of the prison.  *Johnson v. Martin* [*Johnson IV*], No. 2:00-cv-75, 2006 WL

223108, at *2 (W.D. Mich. Jan. 30, 2006) ("So long as Defendants are making a good faith

determination when they screen Melanic Literature to assure only prohibited materials are

prevented entry into MDOC institutions, they are obedient to the Court's Ruling.").

      The MDOC then proceeded to review and reject each of the "five lengthy writings."

The *Johnson* Plaintiffs moved to enforce the injunction; but the Court denied relief because the

Court concluded that the MDOC had reviewed and made a good faith determination as required

by the injunction.  The *Johnson* Plaintiffs then moved to modify the injunction so that the MDOC

would be required to permit Melanic Literature with the objectionable material redacted.  The

Court denied relief and, with that order, ended the 8-year long litigation.

      Although Plaintiff's allegations suggest that he was an adherent of the Melanic faith

as early as 1990, it appears that he was not classified as an STG member because of his Melanic

---

and that the STG designation was the least restrictive alternative for furthering a compelling state interest.  *Id.*, at p. 12-13.

[2] The *Johnson* Court recognized a distinction between "Melanic Literature"—the five principal writings of the Melanic religion and also referred to by the *Johnson* parties as "the five lengthy writings"—and Melanic materials generally. The injunction applied only to Melanic Literature.  The *Johnson* Plaintiffs recognized that religious materials could be banned if they "'facilitat[ed] inflammatory racist activity that could imperil prison security and order.'" *Johnson* (Plaintiff's Response Br., ECF No. 367, PageID.17.)  The *Johnson* Plaintiffs contended that the MDOC had never reviewed the Melanic Literature to determine whether the Melanic Literature, specifically, fell into the category of material that could be banned.  *Johnson* (*Id.*, PageID.14.)  The *Johnson* Plaintiffs identified the five volumes of Melanic Religious Literature as follows: Ceremonies and Rights of Passage; Concepts of Melanics and Melanism, Level I Concepts; Concepts of Melanics and Melanism, Level II Concepts; Tests and Answers for Doctrine Class; and Supreme Constitution and Ecclesiastical Laws.  *Johnson* (Plaintiff's Mot. to Enforce Injunction, ECF No. 413, PageID.519.)  Four of those volumes are the writings Plaintiff now asks the Court to compel Defendants to permit inmates to possess.  (Compl., ECF No. 1, PageID.18.)

adherence until almost two decades later.  On January 7, 2011, Defendant Moore shookdown Plaintiff's cell and confiscated 48 pages of Melanic material, apparently part of the Melanic Literature.  Moore wrote a misconduct for Plaintiff's possession of contraband.  Plaintiff pleaded guilty to the charge.  Later that day, Defendant Hubble designated Plaintiff as a member of an STG because he used/possessed symbols and logos, possessed documents, possessed membership documents, and served as a leader, enforcer, recruiter of an STG.

An STG is defined under MDOC Policy as "a group of prisoners designated by the Director as possessing common characteristics which distinguish them from other prisoners or groups of prisoners and which, as an entity, pose a threat to staff or other prisoners or to the custody, safety and security of the facility."  Mich. Dep't of Corr. Policy Directive (PD) 04.04.113(B) (eff. Feb. 26, 2015).  The policy provides for a Correctional Facilities Administration (CFA) manager who coordinates STG tracking and monitoring for the entire MDOC; in addition, the warden of each facility appoints a local STG coordinator for the institution.  PD 04.04.113(H-I).

A prisoner may be designated an STG I by the local STG Coordinator if there is sufficient documentation of the prisoner's membership in the STG and the prisoner fails to make a credible renunciation of his membership.  PD 04.04.113(S).  The CFA STG manager makes the final determination on designating a prisoner as an STG member.  PD 04.04.113(T).  A prisoner may be designated an "STG II" member if:  (1) he is an STG I member and is found guilty of major misconduct related to his STG activity, (2) was previously an STG I member, and currently presents a threat to prisoners or staff, or (3) is identified as a leader, enforcer, or recruiter in an STG.  PD 04.04.113(W).

5

A prisoner designated as an STG I member must be housed in security level II or higher.  STG I prisoners are also subject to the following restrictions: prisoners are generally limited to three visits per month (the limit does not apply to counsel or clergy); classification to a school or work assignment only as approved by the CFA STG manager; no attendance at group meetings of prisoners, except for approved religious services; and cell search at least once a week. PD 04.04.113(BB).[3]  A prisoner designated as an STG II member must be housed in security level IV or higher.  STG II members are also subject to the following restrictions:  prisoners are generally limited to two non-contact visits per month (the limit does not apply to counsel or clergy); classification to a school or work assignment only as approved by the CFA STG manager; no attendance at group meetings of prisoners, except for approved religious services; no participation in group leisure time activities, except for yard; cell search at least once per week; and out-of-cell movement not to exceed one hour per day, excluding showers, meals, work, etc.   PD 04.04.113(CC).

The STG policy requires local STG coordinators to review each prisoner with an STG designation at least annually to determine whether the designation should be removed or modified.  If the local coordinator believes the designation should be removed or reduced, he or she can make that recommendation to the warden.  If the warden approves, the matter proceeds to the CFA STG Coordinator.  Only that coordinator can decide whether to remove or reduce the designation.

---

[3] See also MDOC Director's Office Memorandum 2020-12 (Eff. 1/1/2020), available at https://www.michigan.gov/documents/corrections/DOM_2020-12_STG_Final_675287_7.pdf.

Plaintiff contends that he should have been reviewed annually.  From 2011 to 2013, Plaintiff was housed at URF.  He did not receive annual reviews of his STG status because his name was found on a "membership roster" in another prisoner's cell.  Defendant Unknown Brown simply continued Plaintiff's STG status without review.

Form 2013 to 2015, Plaintiff was housed at MRF.  Plaintiff asked Defendant Steece to review Plaintiff's STG status.  Steece indicated that he had started the paperwork; but, in May of 2015, Plaintiff was transferred to KCF.  Plaintiff received a misconduct for possession of a razor at KCF.  While he was in segregation, Captain Bigger informed Plaintiff that Steece had started the paperwork, but failed to have the MRF Warden sign the documents so the matter went no further.

Plaintiff was transferred from KCF to LMF.  Plaintiff asked Defendant Rutter to review Plaintiff's STG status.  Rutter told Plaintiff, "I don't believe in letting Melanics off of STG."  (Compl., ECF No. 1, PageID.11.)  Plaintiff, through his attorney, raised the issue with Defendant Larry Brown.  As a result, Rutter had an ARUS poss out renunciation forms to all STG prisoners.  Plaintiff does not indicate whether or not he signed the form and renounced his affiliation with the Melanics.  Plaintiff notes that Rutter returned Plaintiff's form and did not think Plaintiff's status should be changed.

Plaintiff complained to the Legislative Corrections Ombudsman's Office.

Plaintiff was transferred from LMF to MCF on November 13, 2016.  Plaintiff received a misconduct at MCF and, for that reason, did not seek removal of his STG status at MCF.

On November 9, 2017, Plaintiff was transferred to ECF.  At ECF, Plaintiff filed a grievance regarding the affect of the STG designation on his emotional and mental health and

sought to have the designation removed.  Plaintiff asked ECF's STG Field Agents, Morrow and Turner, to help him obtain a review of his STG designation.  Neither Morrow nor Turner took any corrective action to assist Plaintiff.

Plaintiff discovered that a prisoner named Swanson had his STG designation revolved after only nine months at ECF.  Plaintiff wrote Defendants Washington and Larry Brown asking that they assist with the processing and removal of Plaintiff's STG designation.  On January 8, 2020, Plaintiff received a letter from Defendant Larry Brown claiming that the request had been forwarded to Defendant Dunn and the ECF Inspector.

Six days later, Plaintiff wrote Defendants Washington and Larry Brown again because Dunn had not taken any steps to review Plaintiff's STG status.  On January 30, 2020, Defendant Dunn interviewed Plaintiff.  Dunn told Plaintiff that Dunn would be away for a couple of weeks and, thereafter, he would send his final report regarding Plaintiff's STG status to Defendant Larry Brown's office for review.  On February 4, 2020, Plaintiff was transferred to LCF.

Plaintiff wrote the STG Coordinator's Office to inquire whether ECF had forwarded Dunn's STG review.  Plaintiff never received a response.  On March 18, 2020, Plaintiff wrote Attorney General Dana Nessel a letter asking her to encourage the MDOC to comply with the agreements from the *Johnson* litigation.  Plaintiff copied Defendants Washington, Larry Brown, and LaMontagne on the letter.

LaMontagne spoke with Plaintiff after the letter.  He told Plaintiff that he could not process a request to remove Plaintiff's STG designation so soon after his arrival, but that he would

review Plaintiff's case after Plaintiff had been at LCF for six more months.  Nothing has happened since.

Plaintiff contends that Defendants are imposing a substantial burden and significant hardship on the free exercise of his religion in violation of the Free Exercise Clause of the First Amendment and under RLUIPA.  Plaintiff claims that Defendant Washington's STG policy violates the Equal Protection Clause of the Fourteenth Amendment because it permits other STG members to practice their sincerely held religious beliefs by attending services and retaining literature of their faith while denying Plaintiff those opportunities.  Plaintiff claims that Defendant Hubble's punishment of Plaintiff with the STG designation violates RLUIPA, the Double Jeopardy and Due Process Clauses of the Fifth and Fourteenth Amendments.  Plaintiff claims it violated his constitutional rights when Defendants confiscated his Melanic literature without conducting a good faith review, denying him an annual review of his STG status, and continuing to punish him with the STG label.

Plaintiff seeks a declaration that Washington cannot ban all Melanic literature inside MDOC facilities and that the ban violates Plaintiff First Amendment free exercise rights and his rights under RLUIPA, that Washington's STG Policy Directive violates Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment, that Defendants Moore and Hubble failed to conduct good faith review of the Melanic literature in Plaintiff's possession, that Defendants Larry Brown, Unknown Brown, Steece, Rutter, Dunn, and LaMontagne violated Plaintiff's right to due process by failing to ensure that he received annual reviews of his STG designation, and that Defendants subjected Plaintiff to cruel and unusual punishment by placing Plaintiff on STG status for nine years.  Plaintiff asks the Court to issue an injunction discontinuing

the ban on Melanic literature, stopping classification of prisoners in possession of Melanic literature as STG members, removing Plaintiff's STG designation, expunging the 2011 disciplinary conviction from Plaintiff's institutional record.  Finally, Plaintiff seeks a damage award of tens of thousands of dollars.

## II.      Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the

*Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  Plaintiff alleges that Defendants have violated his rights under the First Amendment Free Exercise Clause, the Eighth Amendment, the Fourteenth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection Clause.  Plaintiff also claims Defendants have violated RLUIPA.

## III.    Statute of limitations

State statutes of limitations and tolling principles apply to determine the timeliness of claims asserted under 42 U.S.C. § 1983.  *Wilson v. Garcia*, 471 U.S. 261, 268-69 (1985).  For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years.  *See* Mich. Comp. Laws § 600.5805(2); *Carroll v. Wilkerson*, 782 F.2d 44, 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999).  Accrual of the claim for relief, however, is a question of federal law.  *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984).  The statute of limitations

begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action. *Collyer*, 98 F.3d at 220.[4]

Many of Plaintiff's claims are untimely. He asserts claims arising as early as January 17, 2011. Plaintiff had reason to know of the "harms" done to him at the time they occurred. Hence, his claims accrued as early as 2011. However, he did not file his complaint until September 15, 2020, well past Michigan's three-year limit. Moreover, Michigan law no longer tolls the running of the statute of limitations when a plaintiff is incarcerated. *See* Mich. Comp. Laws § 600.5851(9). Further, it is well established that ignorance of the law does not warrant equitable tolling of a statute of limitations. *See Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991); *Jones v. Gen. Motors Corp.*, 939 F.2d 380, 385 (6th Cir. 1991); *Mason v. Dep't of Justice*, No. 01-5701, 2002 WL 1334756, at *2 (6th Cir. June 17, 2002).

A complaint "is frivolous where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint may be dismissed as frivolous if it is time-barred by the appropriate statute of limitations. *See Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001). The Sixth Circuit has repeatedly held that when a meritorious affirmative defense based upon the applicable statute of limitations is obvious from the face of the complaint, *sua sponte* dismissal of the complaint is appropriate. *See Dellis*, 257 F.3d at 511; *Beach v. Ohio*, No. 03-3187, 2003 WL 22416912, at *1 (6th Cir. Oct. 21, 2003); *Castillo v. Grogan*, No. 02-5294,

---

[4] 28 U.S.C. § 1658 created a "catch-all" limitations period of four years for civil actions arising under federal statutes enacted after December 1, 1990. The Supreme Court's decision in *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004), which applied this federal four-year limitations period to a suit alleging racial discrimination under § 1981 does not apply to prisoner claims under 28 U.S.C. §1983 because, while § 1983 was amended in 1996, prisoner civil rights actions under § 1983 were not "made possible" by the amended statute. *Id.* at 382.

2002 WL 31780936, at *1 (6th Cir. Dec. 11, 2002); *Duff v. Yount*, No. 02-5250, 2002 WL 31388756, at *1-2 (6th Cir. Oct. 22, 2002); *Paige v. Pandya*, No. 00-1325, 2000 WL 1828653 (6th Cir. Dec. 5, 2000).

Plaintiff's claims relating to the confiscation of his Melanic Literature, the minor misconduct for possessing it, his initial classification at an STG member, his continued classification as an STG member, and Defendants' failure to review his STG classification that occurred while Plaintiff was housed at NCF, URF, MRF, and LMF are untimely and Plaintiff's corresponding claims against Defendants A. Hubble, G. Moore, Unknown Brown, Unknown Steece, and Unknown Rutter are, therefore, properly dismissed with prejudice.

## IV.     Res judicata

The doctrine of claim preclusion, sometimes referred to as res judicata, provides that if an action results in a judgment on the merits, that judgment operates as an absolute bar to any subsequent action on the same cause between the same parties or their privies, with respect to every matter that was actually litigated in the first case, as well as every ground of recovery that might have been presented. *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 582 (6th Cir. 1994); *see Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 467 n.6 (1982); *see also Bowen v. Gundy*, No. 96-2327, 1997 WL 778505, at * 1 (6th Cir. Dec. 8, 1997).  Claim preclusion operates to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and by preventing inconsistent decisions, encourage reliance on adjudication. *Allen v. McCurry*, 449 U.S. 90, 94 (1980).  In order to apply the doctrine of claim preclusion, the court must find that (1) the previous lawsuit ended in a final judgment on the merits; (2) the previous lawsuit was between the same parties or their privies; and (3) the previous lawsuit involved the same claim or cause of action as the present case. *Allen*, 449 U.S. at 94; *accord Federated Dept Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).

The Supreme Court in *Migra v. Warren City School District Board of Education,* 465 U.S. 75, 77 n.1 (1984), explained the difference between issue preclusion and claim preclusion, both of which are frequently referred to simply as "res judicata." *Migra* explained:

> Res judicata is often analyzed further to consist of two preclusion concepts: "issue preclusion" and "claim preclusion." Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided. . . . This effect also is referred to as direct or collateral estoppel. Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit. Claim preclusion therefore encompasses the law of merger and bar. *Id.* (citation omitted). An action that is barred by res judicata is legally frivolous. *See, e.g., Taylor v. Reynolds*, 22 F. App'x 537, 538 (6th Cir. 2001); *Hill v. Elting*, 9 F. App'x 321 (6th Cir. 2001).

*Id.* (citation omitted). An action that is barred by res judicata is legally frivolous. *See, e.g., Taylor v. Reynolds*, 22 F. App'x 537, 538 (6th Cir. 2001); *Hill v. Elting*, 9 F. App'x 321 (6th Cir. 2001).

The doctrine of res judicata applies even in the class action context:

> There is of course no dispute that under elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in any subsequent litigation. *See, e.g., Supreme Tribe of Ben–Hur v. Cauble*, 255 U.S. 356 (1921); Restatement of Judgments § 86 (1942); Restatement (Second) of Judgments § 41(1)(e) (1982); *see also* Fed. Rule Civ. Proc. 23(c)(3); *see generally* Moore & Cohn, Federal Class Actions—Jurisdiction and Effect of Judgments, 32 Ill. L. Rev. 555 (1938). Basic principles of res judicata (merger and bar or claim preclusion) and collateral estoppel (issue preclusion) apply. A judgment in favor of the plaintiff class extinguishes their claim, which merges into the judgment granting relief. A judgment in favor of the defendant extinguishes the claim, barring a subsequent action on that claim. A judgment in favor of either side is conclusive in a subsequent action between them on any issue actually litigated and determined, if its determination was essential to that judgment.

*Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984); *see also Chandler v. Corr. Corp. of America*, No. 01-4307, 2002 WL 1879963, at *1 (6th Cir. Aug. 14, 2002) ("Absent unnamed members of a class are bound by a judgment rendered in a properly certified class action.").

Many of Plaintiff's claims that are untimely are also barred by the doctrine of res judicata. For example, the First Amendment, RLUIPA, and equal protection claims based on the MDOC's designation of the Melanics as an STG were decided against Plaintiff in the *Johnson* case. The *Johnson* Court's determination that an MDOC ban on the Melanic Literature did not violate Plaintiff's First Amendment rights is also preclusive.

## V.   Eighth Amendment implications of STG status

Plaintiff contends that the restrictions he suffers because of his STG status rise to the level of cruel and unusual punishment in violation of the Eighth Amendment. The Eighth Amendment prohibits punishments that are not only physically barbaric, but also those which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-103(1976). To establish an Eighth Amendment claim, the prisoner must show that he was deprived of the "minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Restrictions that are restrictive or even harsh, but are not cruel and unusual under contemporary standards, are not unconstitutional. *Id.* Thus, federal courts may not intervene to remedy conditions that are merely unpleasant or undesirable.

Placement in segregation[5] is a routine discomfort that is "'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. 337, 347 (1981); *see also Jones v. Waller*, No. 98-5739, 1999 WL 313893, at *2 (6th Cir. May 4, 1999). The Sixth Circuit has held that without a showing that

---

[5] In the MDOC, security classifications, from least to most secure, are as follows: Levels I, II, IV, V, and administrative segregation. MDOC Policy Directive 05.01.130 ¶ B (Oct. 10, 2011). There are three types of segregation: temporary segregation, administrative segregation, and punitive segregation. MDOC Policy Directive 04.05.120 ¶¶ M, Q, Z (June 1, 2019). Administrative segregation is the most restrictive and is imposed for institutional security, *e.g.*, when a prisoner poses a serious escape risk. *Id.* ¶ Q.

basic human needs were not met, the denial of privileges as a result of administrative segregation cannot establish an Eighth Amendment violation.  *See Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008).

Plaintiff contends that the restrictions he suffers because of his STG status rise to the level of cruel and unusual punishment.  Plaintiff is simply wrong.  The restrictions that apply to an STG I designee are generally less onerous than, or at least comparable to, those imposed in segregation.  If administrative segregation conditions are not harsh enough to constitute cruel and unusual punishment, STG I restrictions are not harsh enough either.  Plaintiff's allegations do not show that his basic human needs have not been met as an STG designee.  Therefore, it cannot be said that STG restrictions violate the Eighth Amendment.

## VI.    Due process protection applicable to security classification

Plaintiff's allegations suggest that he should be entitled to the protections of due process before he is classified as an STG member and then as he is continued in that status year-to-year.  Plaintiff premises that suggestion on MDOC Policy Directive 04.04.113 ¶ FF (eff. Feb. 26, 2015), which provides:

> Each local STG Coordinator shall review the cases of all prisoners designated as STG I or II in their facility at least annually to determine whether the STG designation should be removed or modified.

*Id*.  The policy directive further provides that an STG Coordinator who reasonably believes that a prisoner designated as an STG I member has discontinued STG associations and activities may recommend removal of the STG designation.  *Id*., at ¶ GG.  That recommendation must then be approved by the Warden.  *Id*.  If the Warden approves, the EMS Manager makes the final determination whether to remove the designation.  *Id*.

To the extent that Plaintiff complains that Defendants have failed to follow MDOC procedure with regard to annual review of Plaintiff's STG status, his allegations fail to state a claim

under § 1983.  Claims under § 1983 can only be brought for "deprivation of rights secured by the constitution and laws of the United States."  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982).  Section 1983 does not provide redress for a violation of a state law.  *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994).  Plaintiff's assertion that Defendants violated MDOC policy therefore fails to state a claim under § 1983.

Plaintiff claims, however, that due process should protect the removal or reconsideration of his STG status.  The elements of a procedural due process claim are:  (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process.  *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).  "Without a protected liberty or property interest, there can be no federal procedural due process claim."  *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)).  Analysis of a procedural due process claim involves two steps:  "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

As noted above, STG status carries with it a number of restrictive conditions of confinement.  The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner.  *See Meachum v. Fano*, 427 U.S. 215, 225 (1976).  In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause.  According to the *Sandin* Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his

sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995). The *Sandin* Court concluded that mere placement in administrative segregation did not implicate a liberty interest because the segregation at issue in that case did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005).

The Supreme Court repeatedly has held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum*, 427 U.S. at 228-29. Prisoners cannot "have a protected liberty interest in the procedure[s] affecting [their] classification and security, because the resulting restraint, without more, [does] not impose and 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Cash v. Reno*, No. 97-5220 1997 WL 809982, at *1 (6th Cir. Dec. 23, 1997); *see also Morris v. Metrish*, No. 97-1624, 1998 WL 246454, at *2 (6th Cir. May 5, 1998); *Moore v. Sally*, No. 97-4384, 1999 WL 96725, at *1 (6th Cir. Feb. 3, 1999). Without such a protectible interest, Plaintiff cannot successfully claim he has been denied due process, because "process is not an end in itself." *Olim*, 461 U.S. at 250.

The Sixth Circuit has followed the Supreme Court's rulings in a variety of security classification challenges. For example, in *Guile v. Ball*, 521 F. App'x 542 (6th Cir. 2013), the Sixth Circuit rejected Plaintiff Guile's claim that his designation as a homosexual predator and consequent transfer to a Level V facility with more restrictive conditions resulted in an atypical, significant deprivation. 521 F. App'x at 544; *see also O'Quinn v. Brown*, No. 92-2183, 1993 WL

80292, at *1 (6th Cir. Mar. 22, 1993) (designation as homosexual predator and assignment to Level IV facility with additional restrictions did not implicate a protected liberty interest).

Plaintiff's STG designation is, in effect, just another type of security classification. *Harbin-Bey v. Rutter*, 420 F.3d 571, 577 (6th Cir. 2005).  Nonetheless, because the restrictions might be considered more severe than those that follow from being designated at the highest security level—level V—additional scrutiny of their significance and typicality is appropriate.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court took a closer look at the restrictive conditions of confinement that followed classification to the highest security— "Supermax"—prison in Ohio:

> Conditions at OSP[, the "Supermax" facility,] are more restrictive than any other form of incarceration in Ohio, including conditions on its death row or in its administrative control units.  The latter are themselves a highly restrictive form of solitary confinement.  *See Austin I, supra*, at 724-725, and n.5 (citing Ohio Admin. Code § 5120-9-13 (2001) (rescinded 2004)).  In OSP almost every aspect of an inmate's life is controlled and monitored.  Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day.  A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline.  During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.

> Incarceration at OSP is synonymous with extreme isolation.  In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates.  All meals are taken alone in the inmate's cell instead of in a common eating area.  Opportunities for visitation are rare and in all events are conducted through glass walls.  It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.

> Aside from the severity of the conditions, placement at OSP is for an indefinite period of time, limited only by an inmate's sentence.  For an inmate serving a life sentence, there is no indication how long he may be incarcerated at OSP once assigned there.  *Austin I, supra*, at 740.  Inmates otherwise eligible for parole lose their eligibility while incarcerated at OSP.  189 F. Supp. 2d, at 728.

*Wilkinson*, 545 U.S. at 210-11.  The Court considered, as *Sandin* directs, whether these conditions were significant and atypical compared to the ordinary incidents of prison life.  The Court

19

acknowledged the difficulty in "identifying the baseline from which to measure what is atypical and significant . . . ."  *Id*. at 223.   Nonetheless, the Court concluded that at least some of the restrictions imposed in Ohio's "Supermax" were atypical and significant "under any plausible baseline."  *Id*.  The Court declared that the specific restrictions that rendered confinement in "Supermax" atypical and significant were:

> almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room.  Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components.  First is the duration.  Unlike the 30-day placement in *Sandin,* placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually.  Second is that placement disqualifies an otherwise eligible inmate for parole consideration.  *Austin I*, 189 F. Supp. 2d, at 728.  While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context.  It follows that respondents have a liberty interest in avoiding assignment to OSP.  *Sandin*, *supra*, at 483.

*Id*. at 223-24.

Two months after the Supreme Court issued the *Wilkinson* opinion, the Sixth Circuit considered whether the restrictions that followed the STG designations (I and II) were significant and atypical under *Sandin*.  *Harbin-Bey*, 420 F.3d at 576-77.  The court held that they were not atypical and significant and that, therefore, the plaintiff did not have a liberty interest protected by the Fourteenth Amendment Due Process Clause and Plaintiff's complaint was properly dismissed upon initial review.  *Id*.

Four years later, in *Heard v. Caruso*, 351 F. App'x 1 (6th Cir. 2009), the Sixth Circuit again considered the restrictions that followed the STG II designation.  In *Heard*, however, the plaintiff had supplemented his complaint to include allegations that parroted some of the

language *Wilkinson* Court used to describe Ohio's "Supermax" restrictions.[6]  The court of appeals

concluded those allegations warranted factual inquiry along the lines of that conducted by the

Supreme Court in *Wilkinson*.

On remand, this Court granted summary judgment in the *Heard* defendants' favor

on Heard's due process claim.  *Heard v. Caruso*, No. 2:05-cv-231 (W.D. Mich. Aug. 30, 2011)

(ECF No. 410).  The Court found that the restrictions attendant to the STG II designation did not

rise to the level of the "Supermax" restrictions that the *Wilkinson* Court found warranted due

process protections.  Specifically, this Court found that the STG II restrictions did not extremely

isolate the prisoners or disqualify them from parole.  This Court concluded, therefore, that due

process protection for the STG II designation was not required.  (2:05-cv-231, ECF No. 410,

PageID.2470.)[7]

Two of the key factors that prompted the *Wilkinson* Court to conclude that due

process protected the "Supermax" classification—parole disqualification and extreme isolation—

---

[6] Prisoner Heard's supplemental allegations were as follows:

> Security Threat Group designations to status II result in plaintiff being placed in a maximum security prison, which is the most secured of all Michigan Department of Corrections prisons; but plaintiff does not challenge the increase in classification as a result of the STG designation.  The challenge is to the atypical and significant hardships place[d] on plaintiff as a result of the designation that trigger due process.  The designations are indefinite and paroles are automatically denied, there are only five minute showers (which include washing and drying off); visits are restricted to two one hour non-contacts visits per month; and all human contact is limited to yard, dining hall, library and religious service which culminate to a potential maximum of 21 hours out [of] the cell per week.  Cell to cell communication is prohibited, the lights, though [they] may be dimmed at night, [are] on 24 hours a day.  These conditions are not ordinary conditions in the life of a prisoner in lower levels (1-4) in MDOC.

*Heard*, 351 F. App'x at 8-9.  Heard also suggested that the designation disqualified him from parole.  *Id*.  Plaintiff's allegations here do not come close to the allegations in *Wilkinson* or *Heard*.

[7] The Sixth Circuit Court of Appeals affirmed this Court's summary judgment on that claim.  *Heard v. Caruso*, No. 12-1517 (6th Cir. Mar. 12, 2013) (*Heard II*).  The court of appeals did not consider whether Plaintiff had a liberty interest; instead, the court reasoned that even if he did have such an interest, he received all of the process he was due. *Heard II*, at p. 6 (No. 2:05-cv-231, ECF No. 442.)

are not present here.  Without those factors, the conditions of confinement for prisoners designated STG II are not significant and atypical departures from the normal incidents of prison life.  The lesser restrictions of STG I, likewise, would not be significant and atypical departures either. Plaintiff has failed to identify a protected liberty interest with respect to his security level or STG classification and, consequently, he has failed to state a claim for violation of his due process rights by virtue of Defendants' actions with respect to Plaintiff's security level or STG designation.

## VII.    Equal protection

The *Johnson* Court dismissed the *Johnson* Plaintiffs' equal protection claims. Plaintiff suggests two distinct equal protection claims in his complaint:

> ¶ 48—Plaintiff then discovered that a prisoner named Swanson had his designation removed [after only] nine-months-at ECF, so he wrote Defendants Washington and Larry Brown on January 1, 2020, requesting that they assist with the processing and removal of his STG designation, too.

> ¶ 64—Defendant Washington's STG policy, PD 04.04.113, violates the Equal Protection Clause of the Fourtenth Amendment to the United States Constitution, because it allows other designated STG members to practice their sincerely held religious belief by attending services and retaining literature of their faith, while at the same time denying Plaintiff the opportunity topractice his sincerely held religious belief by retaining literature of his Melanic faith.

(Compl., ECF No. 1, PageID.12, 16.)  Plaintiff suggests that he was not treated equally with prisoner Swanson because Swanson's STG designation was removed after only nine months while Plaintiff waited almost two years for a review at ECF and than that review was not completed before he was transferred.  And, Plaintiff claims other STG members are permitted to practice their respective religions while he is not.

### A.    Class of one discrimination

The Equal Protection Clause prohibits discrimination by government actors which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.  *Rondigo, L.L.C. v. Twp.*

*of Richmond*, 641 F.3d 673, 681-82 (6th Cir. 2011); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005).  With regard to Plaintiff allegations about the different treatment afforded prisoner Swanson, Plaintiff does not claim that he was treated differently because of his membership in a suspect class or that the differing treatment burdened a fundamental right.  Stated differently, Plaintiff does not contend that he was treated differently than Swanson because Plaintiff of their differing races or religions or that he was treated differently and that the differing treatment burdened, for example, the free exercise of his religion.  Instead, Plaintiff states only that Swanson was reviewed after nine months at ECF while Plaintiff waited two years for an incomplete review.  Essentially, Plaintiff alleges that Defendants have intentionally treated him differently than others similarly situated without any rational basis for the difference—a "class of one" equal protection claim.

The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'").  Plaintiff alleges disparate treatment here, but his allegations are conclusory.  They appear in one paragraph of the complaint, paragraph 48, which is quoted in its entirety above.  Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

An "equal protection" plaintiff must be similarly situated to his comparators "in all relevant respects . . . ."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *United States v. Green*, 654

F.3d 637, 651 (6th Cir. 2011); *see also Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) ("'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'"); *Tree of Life Christian Schools v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018) ("A plaintiff brining an equal protection claim must be 'similarly situated' to a comparator in 'all relevant respects.'").  Plaintiff's allegation implies that he and Swanson are similarly situated, but he states no facts to support that implication.  *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 575 (6th Cir. 2008) ("Although the plaintiffs claim that they have been treated differently from other individuals seeking rezoning, they fail to allege any specific examples of *similarly situated* individuals . . . ."); *Sanders v. City of Hodgenville*, 323 F. Supp. 3d 904, 911 (W.D. Ky. 2018) ("Sander's class-of-one claim fails as a matter of law . . . Sanders fails to identify any similarly situated individual who was treated differently.").  Plaintiff completely fails to allege that Swanson was similarly situated in all relevant respects.  *Umani v. Mich. Dep't of Corr.,* 432 F. App'x 453, 460 (6th Cir. 2011) (To be a similarly-situated person, "the comparative [prisoner] 'must have dealt with the same [decisionmaker], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or [the defendant's] treatment of them for it.'") (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)); *Project Reflect, Inc. v. Metropolitan Nashville Bd. of Public Educ.*, 947 F. Supp. 2d 868, 881 (M.D. Tenn. 2013) ("Plaintiffs . . . fail to plead the existence of a similarly situated comparator . . . [therefore,] the Complaint does not contain sufficient factual matter to state a plausible claim.").  Plaintiff offers nothing to indicate that he and Swanson are members of the same STG, are in a similar position with regard to renunciation, or are at a similar point with regard to the STG review process based

on their prior placement.  Therefore, Plaintiff has failed to state a claim for violation of his equal protection rights based on the differing treatment of Plaintiff and Swanson.

### B. Fundamental right/suspect class discrimination

Plaintiff's other equal protection claim is addressed to the differing treatment afforded Melanics and other persons designated as STG members with regard to group services and possession of religious literature.  The lines Plaintiff draws, however, are not accurate.  That differing treatment is not limited to STG members.  It is true for all prisoners, whether or not they are designated as STG members.  Many prisoners are permitted religious group services and possession of religious literature; Melanics are not.  That is the type of equal protection claim that burdens a fundamental right and targets a suspect class.  Such a state practice would require strict scrutiny.  *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).  The MDOC's treatment of the Melanics as an STG, its ban of Melanic group worship, and its limitations on the possession of religious literature, however, have already been subjected to strict scrutiny in *Johnson*—and the Court concluded that those practices survived strict scrutiny.  No matter how Plaintiff tries to repackage this claim, it has already been decided against him.

## VIII.   Free exercise and RLUIPA

The Free Exercise Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Const. amend. I; *see also Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (holding that the Fourteenth Amendment incorporates the First Amendment's protections against states).  While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion.  *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted).  To establish that this right has been violated, Plaintiff must establish that: (1) the belief or practice he seeks to protect is religious

within his own "scheme of things," (2) that his belief is sincerely held, and (3) Defendant's behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, No. 95-2348,1997 WL 428903, at *2 (6th Cir. July 30, 1997) (noting that "sincerely held religious beliefs require accommodation by prison officials").

Plaintiff has sufficiently alleged his sincerely held religious beliefs and there is no doubt that group worship and studying religious literature are religious practices.  The next consideration is "whether the challenged practice of the prison officials infringes on the religious belief. . . ."  *Kent*, 821 F.2d at 1224-25.  A practice will not be considered to infringe on a prisoner's free exercise unless it "places[s] a substantial burden on the observation of a central religious belief or practice. . . ."  *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989); *see also Welch v. Spaulding*, 627 F. App'x 479, 485 (6th Cir. 2015) (McKeague, J., dissenting) ("To violate the First Amendment, the diet must impose a substantial burden on the inmate's exercise of religion.").  There is also no doubt that banning group worship, confiscating and restricting religious materials, and declaring a religion to be an STG would substantially burden the exercise of that religion.

Nonetheless, imposing a substantial burden on a religious practice does not necessarily violate the First Amendment Free Exercise Clause.  Prison officials may impinge on these constitutional rights where their actions are "reasonably related to legitimate penological interests."  *See Flagner*, 241 F.3d at 483 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess the official's actions by reference to the following factors:

1. does there exist a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

2.     are there alternative means of exercising the right that remain open to prison inmates;

3.     the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and

4.     whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-91).

The *Johnson* Court concluded that the designation of the Melanics as an STG, the ban of group worship, and the restrictions on religious literature, did not violate the Melanics' First Amendment free exercise rights because those actions were reasonably related to legitimate penological interests.  Therefore, Plaintiff's First Amendment free exercise claims have already been decided against him.

The analysis of Plaintiff's RLUIPA claim parallels the analysis of his free exercise claim.  In relevant part, RLUIPA prohibits any government from imposing a "substantial burden on the religious exercise" of a prisoner, unless such burden constitutes the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a).  The term "religious exercise" "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7).

The phrase "substantial burden" is not defined in RLUIPA.  The Sixth Circuit Court of Appeals has relied upon the Act's legislative history to conclude that the term has the same meaning under RLUIPA as provided by the Supreme Court in its "free exercise" decisions.  *Living Water*, 258 F. App'x at 733-34.  Accordingly, a burden is substantial where it forces an individual to choose between the tenets of his religion and foregoing governmental benefits or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Id.* (citations omitted); *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's

institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise).  There can be no question that the STG designation, banning group worship, and restricting religious literature place a substantial burden on Plaintiff's religious exercise.

But, again, the presence of a substantial burden on religious exercise does not end the analysis.  RLUIPA, 42 U.S.C. § 2000cc-1(a), provides that a substantial burden is permitted where "the government demonstrates that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  *Id.*; *see also Haight v. Thompson*, 763 F.3d 554, 559-60 (6th Cir. 2014).  The *Johnson* Court determined that the MDOC had made the necessary showing with regard to all of the actions the MDOC had taken against the Melanics except one:  a ban on the Melanic Literature, which includes the four volumes that Plaintiff asks the Court to compel the MDOC to permit Melanics to possess.

Plaintiff alleges that the MDOC continues to ban the Melanic Literature despite the *Johnson* decision.  That is a conclusory and misleading statement.  During the pendency of the *Johnson* case, the MDOC examined each of the Melanic Literature volumes and determined that each volume was a threat to the security of the institution because each volume advocated violence, racial supremacy, or a hierarchical structure that commanded obedience to the exclusion of or contrary to the hierarchical structure of the MDOC.  The *Johnson* Plaintiff's challenged the MDOC's determination; but, the *Johnson* Court concluded that RLUIPA required nothing more than the type of examination and determination that the MDOC performed.  The *Johnson* Court, therefore, already decided the RLUIPA claim regarding the Melanic Literature ban in favor of the MDOC and against Plaintiff's position.  Plaintiff is precluded from renewing his RLUIPA

challenge simply because the MDOC continues to act on the examination and determinations that the *Johnson* Court accepted.

## <u>Conclusion</u>

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c).  The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  For the same reasons the Court concludes that Plaintiff's claims are properly dismissed, the Court also concludes that any issue Plaintiff might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).  Accordingly, the Court certifies that an appeal would not be taken in good faith.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:   November 19, 2020                    /s/ Paul L. Maloney
                                             Paul L. Maloney
                                             United States District Judge